Okay, Mr. Harrell, thank you. Thank you and good morning, Your Honors. May it please the Court, my name is Justin Harrell and I represent Mr. Paul Popart. Your Honors, Mr. Popart did everything that he was supposed to do, everything that the Constitution demands of him. But for the fine folks at the Jefferson Parish Sheriff's Office, it was just not enough. Mr. Popart found himself arrested. He found himself in an interrogation room at the Detective Bureau of the Jefferson Parish Sheriff's Office. And at that time, he refused to sign a waiver of his rights. He made a clear, definitive declaration that he wished for his counsel to be present before questioning and he made an unequivocal invocation of his right to remain silent. But for Jefferson Parish Sheriff's Lieutenant Bruce Harrison, it was not enough. Lieutenant Harrison continued to question and to speak to Mr. Popart in a manner designed to overwhelm his resistance and to lead to Mr. Popart giving inculpatory statements, which he in fact did. So why don't you give us some details of what was said during that conversation? After Mr. Popart elected his right to silence and his right to counsel, Lieutenant Harrison did in fact refrain from questioning except for one question. He said, do you mind if I tell you a little bit about the case? Mr. Popart said, okay, sure. And at that time, Lieutenant Harrison proceeded to recite the facts of the case as the state of Louisiana believed them to be. He, Your Honor, this is a tried and true interrogation technique. I call it goading. I call it inciting. The suspect, the citizen has invoked their critical right to silence and the law enforcement officer continues to speak in an effort to finally anger you enough to say something. Well, I mean, are you testifying about that or is there something in the record about that this is customarily done or what do you base that on? I've seen it enough, Your Honor, to know that it's unfortunately a frequent tactic. But in this case, Lieutenant Harrison does in fact testify on the record on at least two occasions as to what he did, which was recite what he called, and I think the quote was, I explained the simplicity of the case to Mr. Popart. So in other words, he said, this is what the evidence shows. This is what we think we have against you. And at some point, Mr. Popart did what I think anyone would do. He got his ire up, he got frustrated, and his resistance to speaking was overwhelmed and he interjected, and that's when the trap is sprung. The law in this case is settled. It's been settled for 50 years. The right to stop questioning before interrogation begins or in the middle of interrogation is sacrosanct. It's been called a critical safeguard of the Fifth Amendment. Once you invoke that right for silence, the law enforcement officers must scrupulously honor it. In this case, Lieutenant Harrison didn't scrupulously honor it. He didn't even inadvertently honor it. He immediately leapt into an additional statement of facts with the intention to get Mr. Popart to speak. Your position then is that that was tantamount to additional questioning, even though it was a statement or a narrative rather than a direct question? That's not correct, Your Honor. My position is that the prohibition against questioning, or rather let me rephrase that, the right to silence encompasses not only questioning, but any word or act by law enforcement with the intent to or the reasonable likelihood of overwhelming the defendant's, the suspect's invocation of silence and leading to an inculpatory statement. The spectrum is large. It's not just questioning. It's, let me tell you how we've already got, you know, you dead to right on this. You're already in the corner on this. What's the primary case on which you rely for that proposition? Rhode Island v. Ennis, Your Honor, I believe is the case that states that any word or act falls within the compass of the Fifth Amendment invocation of silence. Your Honor, the statements that Mr. Popart made were inculpatory. They were incriminating. And they had a damaging and disastrous effect on his defense at trial. The state of Louisiana, I believe, is going to submit this is a harmless error if, if this court finds that this confession was improper or inadmissible. I believe the state's position is it's all water under the bridge. It was harmless error. We can laugh about it now. No harm, no foul. But, Your Honor, as I submit, there is nothing more powerful in a criminal trial than the defendant's own incriminating or inculpatory statements. Juries and triers of fact put great weight and afford tremendous credibility to the statements of the accused if those statements are made against his or her interest. So the statements that were obtained illegally in this case and used, I believe, illegally in trial had a tremendously damaging effect on Mr. Popart's defense. They established plan, motive, intent, preparation, opportunity, the absence of mistake. They placed Mr. Popart at the scene where the alleged threat occurred at a time consistent with the state's timeline. But there was independent evidence as to all of that. Your Honor, I believe that to say there was independent evidence I don't think gives a full weight to what's going on in this case. If there was truly independent evidence, then Mr. Popart's statements would have been irrelevant. They would have been simply cumulative. They would never have been admitted in trial at all. But they're admitted in the trial. Why? Because they tell a different part of the story. They tell Mr. Popart's part of the story with his own words. And he's powerless at trial to defend himself. He can't cross-examine himself. He can't do anything except violate, you know, waive his Fifth Amendment right to silence at trial to explain his statements just the same way the state of Louisiana trounced on those rights during interrogation. So he is in a terribly difficult position. I do not believe that the statements of a defendant against his own interest are ever the same, ever cumulative with something that comes from other places. And, Your Honor, I would say that the timeline in this case and Mr. Popart's presence at the bar at the time that the state says he was there making this threat, that was, in fact, disputed. There were witnesses that would have testified that. There were witnesses that would have testified otherwise. But using Mr. Popart's statement, placing himself there, eviscerated his defense. It eviscerated his defense. Now, his defense attorney attempted to mitigate that loss by raising some of these issues on opening statements and trying to draw the sting out of them. But his attorney's, you know, belated efforts to cure this don't waive this issue. However you cut this, Lieutenant Bruce Harrison and the Jefferson Parish Sheriff's Office violated Mr. Popart's rights whole scale. There is no question that he demanded his attorney and that he demanded his right to silence and they continued to speak to him with the clear intent of overwhelming his resistance. And the statements, once obtained, were used at trial and they had a powerful prejudicial effect. So I submit to Your Honors that the state courts have misapplied and misinterpreted the Constitution. Tell me what the statements did where there was no independent evidence other than his statement. I'm sorry, if you could. He made statements. Yes, Your Honor, that's correct. And I guess it harks back to Judge Smith's question, but what is it that these statements did or what evidence was provided in these statements that was not corroborated or supported by some other evidence that was introduced in the prosecution's case? And that's a good question. And the case, of course, involves a public intimidation charge. Mr. Popart is alleged to have disseminated and published certain photographs that were unfavorable to a JPSO deputy by the name of Steve Higgerson. Those photos ended up online. Mr. Higgerson got himself in some hot water. And now Paul Popart is being charged with public intimidation because the claim is, the allegation is, he released those photos as a threat to or in retaliation of Mr. Higgerson appearing at an unrelated criminal proceeding. There were two witnesses that attempted to establish that, as I recall the record, Your Honor, two witnesses that attempted to establish that Mr. Paul Popart was present at the bar called Mike's Place in Metairie at a time when he made this overture or this threat that he was going to disseminate these photographs if Mr. Higgerson showed up. Well, you said they tried to establish. They testified that he was there. They testified that he was there, but it was the defense theory that the detective, or excuse me, the deputy Higgerson and the bar owner were close friends, associates, that the bar, that Deputy Higgerson found himself fighting for his job, fighting for his integrity, that there was a thin blue line, that there was Jefferson Parish authorities, Jefferson somebody to gut and to blame and to punish for these photographs ending up online. That was the defense theory, and part of that theory was that the bar owner and that the deputy had been long-term friends, that the deputy had served doing private detail for years, and that therefore they were corroborating. They were in cahoots. I'm just summarizing the defense theory. But Mr. Popart now places himself, not making the threat, but places himself in that bar at that time. Well, then there goes that. That theory, that theory is then cut off at the knees. He's not the only person who placed him in the bar. He's the only, no, Your Honor, but he corroborates key and critical parts of the state's case, and I guess that's the point. They go from being disputed at trial to irrefutable. Once the defendant makes comments that corroborate key elements of the state's narrative, the state's telling a story, and as long as the defendant says, I'm not participating or none of that's true, then he's got a full range, a full spectrum of things used in his defense. But once you take his own words and use them against him to corroborate key portions, he loses that ability to defend. And in this case, this was not immaterial detail. This was significant detail about the timing of events, the origin of these photographs, Mr. Popart's planned preparation, opportunity to engage in this intimidation. So this was highly prejudicial at trial. So let's go back a minute to the Miranda issue. I just want to understand your position. Once a suspect is being questioned and then invokes his right to an attorney or his right to silence, are you saying that the investigator or the police personnel can't make any kind of statement at all about the facts of the case or the circumstances of the case? I understand you're not arguing they can't comment about, hey, it's raining outside or something like that. That's correct. I'm not taking your position that far, but are you saying that the officer can't say anything that relates to the case? Anything with the intent to induce an inculpatory statement, yes, Your Honor. Any photographs, any comments, anything that's intended to overwhelm or reverse the citizen's position that they wish to invoke their right to silence? Our question actually is framed at a little more abstract and distant point. Our real question here is whether or not the state court's denial was objectively unreasonable. I believe it is. I absolutely believe it is. I bet you do. Of course, you wouldn't be here. But that is the question we're asking. That's correct. In terms of, the question is not how we are going to decide about Miranda or our interpretation of it vis-a-vis other circuits. The question is whether or not the very existence of a split among the circuits themselves would answer the question as to whether or not this was objectively unreasonable for the circuit state courts to decide it. It's stated another way. If the state court's position is the same as some of our circuit courts have adopted, why doesn't it follow that? And that's a habeas posture given 2254 review that we have to reject your argument. Your Honor, with respect to the other circuits, I believe any court, state or federal, that would hold a law enforcement officer is permitted to continue to speak in an attempt to induce a statement after a witness or suspect has invoked their right to silence. Any decision that supported that would be objectively unreasonable under the Constitution. And the state court was here. I understand that. But what we're dealing with is the fact is that other courts have so said. We have to conclude that I find it difficult to reach that contrary conclusion with regard to the certainty of the law here if other circuits are really dead against you. I certainly can appreciate the court's dilemma, but it would be my position that one dissenting court or several dissenting courts, for that matter, can't I'm sympathetic to your Miranda argument, but there is also a threshold issue here that may not appear, I don't recall, in some of the other circuit decisions is that the officer here, having accepted the invocation of the Miranda rights, then asked him, I would like to take you back over the facts of the case, etc. Raising the question of whether or not at that point, framing it more narrowly, he could waive at that point, having previously invoked his rights, and then they didn't just go badger him that someone could start in. He asked if it's permission to take him over. So you have a, quote, waiver of some sort. What's the operative effect of that? I'm out of time, but if I may respond, I would take the position, if I had to be hyper-technical, and I've attempted to avoid that, that asking the question, may I go over the facts with you, is a question, and it is whole scale, completely, and utterly prohibited. It would be no different than, can I show you the pictures of the scene? Can I take you to the scene? That question alone, too soon, immediately following that invocation for there to be an objective waiver. Thank you very much. You have time for a vote, Mr. Bell. Yes, sir. Thank you. Ms. Clark? May it please the Court, Juliet Clark, Assistant District Attorney for the State of Louisiana. I'd like to begin, if I might, by addressing some of the factual points that counsel has misstated, according to my reading of the record. First of all, the defendant was not alleged or charged with having disseminated the pictures that appear on the website, thedirty.com. He was charged with public intimidation, which required the communication of a threat that would influence the way that a public officer or witness, in this case, the detective was also a witness, would fulfill their duty. So the point here, and what the Assistant District Attorney said several times in argument was, you know, I don't have to prove a lot of these things. What I have to prove is that he communicated this threat. And he communicated the threat when, a few days before the case that Mr. Popart was about to be tried on, when Mr. Popart went into the bar where the incident had happened in front of, where Mr. Hickerson, Officer Hickerson, was a detail officer. He went into the bar, talked to the bar owner, and another gentleman who were there and made the statement that let him know, or words to the effect of, let him know that if he testifies, there's pictures that's going to go public of him and a girl. And that was the threat. That was then, because he said, let him know it was communicated by the bar owner to Officer Hickerson. That was the substance of the offense in this case, not who took a picture, not who actually posted the picture. What was relevant, obviously, in terms of the defendant's intent to communicate that threat and the threat that he had a picture of a girl, was they searched the defendant's residence, pursuant to a search warrant, and they found, you know, what was introduced to the trial was downloaded, you know, like printed out screens of, you know, the Dirty.com website with the photos at issue that have the Dirty.com logo on them and some other information. The defendant actually had a CD that had numerous photos, you know, lots and lots of photos, and two of those photos on that CD were the very photos that wind up posted on the Dirty.com. So the defendant did have pictures of, you know, I don't want to say incriminating, but of an embarrassing nature, given, you know, the officer's employment. And that was introduced at trial. You know, in that context, whether the defendant denied posting the photographs, whether he, nobody had to prove that he did post the photographs, whether he admitted taking them was irrelevant. You know, everyone knew he had the photographs. It was introduced at trial on his CD, the pictures. The incriminating point in his statement to the officer was placing himself at the bar. I'm sorry, Your Honor? I said he placed himself at the bar in his statement to the police officer, which is the issue before us. How do you maintain that that's harmless error? Well, there were two witnesses that testified at trial that he was there, and I also disagree with the statement that there were witnesses that would have disputed that he actually went to the bar, and it wasn't a specific date or time or whatever. Well, let's go at it a different way. You did put this in, the prosecutor put this in evidence, that is, he admitted it. He offered that in evidence to the jury. Right. And in his closing argument, I suggest to you, he probably made mention of that, too. Well, I can't recall offhand, Your Honor. Well, go back, I haven't seen the record, but I would be very surprised if he also didn't make it. My point being that I find it difficult to find harmless error documents when the prosecutor itself draws upon the evidence and utilizes it at trial on a witness identification case. So move away from that issue. Our real problem here has to do with a Miranda violation, if any. Well, two things with regard to that. With regard to the claim that the defendant demanded an attorney, what the testimony actually was at the trial was that when Officer Harrison advised him of his Miranda rights, he said, Do you understand? The defendant says, Yes. The defendant says, Will you sign an initial form to . . . Well, you're not arguing he didn't invoke his rights. No, I was saying he invoked his rights, but he didn't, you know. He refused to waive his rights, and he declined to make a statement. All right. So we have an invocation of Miranda. Right. I just want to set aside the zone of Edwards because he did not, I don't think, unequivocally invoke his right to counsel. All right. Let's assume he invoked his rights. Now what? Well, am I going with that he didn't waive his rights and he refused to make a statement? Well, no. I thought the best argument you could make on the facts was that he invoked his rights, but then he waived when the officer thereafter asked him if he could go forward. Now you're raising another issue. Perhaps that's okay, but I didn't understand from the briefing that you were really challenging the fact that you were maintaining he never invoked his rights. No, no, no. I'm saying he refused to make a statement. He refused to waive his rights and waive his statement, but he did not expressly and unequivocally invoke his right to counsel as a separate matter. That's my position. Okay. But in terms of that, what the detective or what Detective Harrison said to him is basically he just wanted to lay out what he thought was the simplicity of the case. And as I've stated, the case was very simple. You went into a bar. I mean, there's no testimony about this or very little because the defense cut off the questioning about the subject, but the substance of the case is you went into a bar. You said if he shows up to testify, there's photos of a girl that's going to go public. That's the substance of the case right there. It's not a harangue. It's not a lengthy deal to wear down the defendant. But you don't deny that that's a standard interrogation technique just to say, let me tell you what we have. Right, and what defendant doesn't want to know. And then the officer goes silent and waits for the suspect to speak. Isn't that pretty standard in interrogation? I would say so. The defendant would want to know, what do they have? If I'm going to go back and I'm going to think about it, what do you have? I mean, I would agree with that. But here, I would suggest to you. So it was an interrogation technique here? Well, I wouldn't say it was an interrogation technique, but he was laying it out for him. The defendant, I think if you go back to Rhode Island and Viennese, I think you have to look at, was this something that was so calculated to elicit a response? And I think that the defendant here agreed to listen. And the defendant, when he decided to, made a voluntary statement. But even if, and again, on habeas review, the standard is, did the state court decide the issue in a manner that was contrary to or an objectively unreasonable interpretation of Supreme Court holdings? And here, so it's not just wrong, but unreasonable. There's no, so again, I would suggest that there was not, that there was no violation here that, and not just that there was no violation here, but that the state decision was not objectively unreasonable and that the district court in adopting the magistrate's report and recommendation did not err in finding that it was not objectively unreasonable. But again, with regard to the harmless error, you know, again, the issue here was, did the defendant communicate a threat designed to influence Officer Haverson in the performance of his duty, which was to appear and testify as a witness. And he was a witness, and again, influencing a witness. The defendant did that simply by going to the bar and communicating to the two witnesses the threat. Now, for it not to be harmless error, it would have to be substantial, it would have to have a substantial impact and be substantially injurious, and that is not the case here because his testimony was simply cumulative of the two other witnesses who testified at the trial in this matter. At the trial in this matter, you know, the defense conceded that he was there at the bar. The defense counsel admitted, and not admitted, but he . . . Henry Choice was conceded. I had already done it. But again, what was the harm in it? Because, again, you know, there were two witnesses that confirmed that. This way. Miranda responded to custodial interrogation. Station house interrogation. The inherently coercive environment of the police station and interrogation techniques, which are quite familiar and taught in police academies and et cetera, et cetera, et cetera. And I'm not being critical of that. That's the phenomenon. Now, what happens is that that means that, as the Supreme Court announced Miranda, that once you invoke your rights, then the state cannot use techniques or whatever to try to inflate them otherwise. And one, this is not just a little chatting session with a police officer. He's invoked his rights. I don't explain to you what we have. What's the purpose of that? We know, everyone knows, that the purpose of that is to get him to talk. And as I read the law, it's quite clear you can't do that. Now, as other circuits have done that, so I think that's where your best case lies, is arguing the uncertainty of the law. But as an original proposition, which we don't have before us, it's very difficult for me, this judge, to see that this is not a routine interrogation technique and it's used because it's effective. So we do it the other way. But that's not what, to me, Miranda teaches. The case law seems to be split on that. And that's where I would fall. I'm trying to direct you back to what I think the real issue in the case is. Maybe if I'm stating the wrong issue, fine, but I thought we were here on an habeas review. And, Miranda, again, I'm sorry, Your Honor, the Supreme Court, in terms of whether or not there was an unreasonable application of Supreme Court jurisprudence, the Supreme Court has not articulated a bright-line test. Even in Mosley v. Michigan, which was referenced in the... Well, when John Frank argued Miranda in the United States Supreme Court, that was the argument that was made, and that's the way I read Miranda. And it was responsive to a very difficult tension in police-enforced law enforcement, and police-enforced law enforcement has pretty much abided it. So it's not an egregious violation, but to suggest this is not a routine interrogation technique, that's not what I read in the cases in my experience. And I would suggest, again, it's not just the idea behind or the dicta or whatever, but it's the actual holding of the Supreme Court that would, being contrary to, would make it an unreasonable application. So that's what I would suggest there with that. And, again, in terms of the harmless error, it would have to be a substantial injurious impact upon the verdict here. You had two witnesses who placed him there, who were making a statement, buying the DJ lights and everything. And, you know, he never admitted making the threat, and making the threat was the critical part of that case. What he did concede was that he was there, which two witnesses already were testifying that he was there. And what he did concede was taking the picture. It didn't matter who took the picture. The state proved that he had the picture. Who were the two witnesses? I mean, that's not in my name. What were they? Mr. Barattini was the bar owner. And Artie Masell was a gentleman who was known to Mr. Barattini. He was there that day helping him. Those were the two gentlemen who were there. They both testified. The defendant came in. There was a conversation about how he wanted to buy these DJ lights, how he paid $50 for the DJ lights. And at the conclusion of that conversation, he made the comment about how let him know, you know, if he testifies, there's pictures of a girl, they're going to go public. So that's what happened there. And it was, again, you know, it's hard to see it as substantial and injurious when it was cumulative of what two people said. You know, unless there's, are there any other questions about the harmless error? I think that, you know, I would strongly argue that it's not an unreasonable application, you know, in light of the, they're not being a bright line test, you know, in light of the other factors here. And, you know, I will just throw in an ad that this is a defendant with a lengthy criminal history with a great deal of experience with law enforcement. He was, you know, after being convicted, he was a fourth felony offender, but he has other arrests and convictions besides that. So it's not, you know, a person who walked in the police station and had no idea what was going on. But again, even assuming that there was an unreasonable application of Supreme Court precedent in this case, based on, you know, the actual things that had to be proven, what the actual charge was, and what the other evidence was, the introduction of the statements, even if they were, even if that was erroneous, is clearly harmless under the, under the Cotega standard, which is adopted in Breckey-Abramson. All right. Thank you, Ms. Clark. Mr. Harrell, you've saved time for rebuttal. Your Honor, I just have a few quick points, but before I make them, does the court have any questions for me in light of the state's presentation? We'll let you know. Very well. Miranda v. Arizona states that once there's been an invocation of the right to remain silent, there can be no questioning. Yet we know Lieutenant Harrison continued to question at least once and then continued to recite facts about the case. Michigan v. Mosley says that once there's an invocation, it must be scrupulously honored. We know that Lieutenant Harrison did not scrupulously honor or even passingly honor this invocation. Mosley also says that law enforcement officers must refrain from repeated efforts to wear down the suspect's resistance. Lieutenant Harrison missed that day at the Academy. And in Rhode Island v. Ennis, which has been adopted by this circuit, the court has held that all words and acts intended to wear down the resistance and overwhelm that invocation must stop at the door once the right to remain silent has been elected. I submit, Your Honors, that that is the objective law of this country and of this circuit. And the state of Louisiana misimplied it and misinterpreted it when they failed to grant the motion to suppress, failed to overturn the conviction, and failed to grant post-conviction relief in this case. Now, what do you do with the fact that I don't disagree with what you just argued, but some other courts do? Now, what do we do with that when the question is whether or not the state of Louisiana, it's not whether we agree with them or disagree with them, but whether or not it was objectively unreasonable for them to so conclude. I understand we went through this before, and you said, well, they're all undone, but that's a little difficult. I understand the court's question. I'm just not so sure I sense and understand the court's pause in it. The state of Louisiana must be guided by Louisiana law, and of course the law of the Supreme Court of the United States. This court is a persuasive authority that the Louisiana Supreme Court can look at, but it's not binding on the Louisiana Supreme Court. Your interpretations are binding on three other states based on your interpretation of the U.S. Supreme Court case law. I think the only thing that matters here is did the state of Louisiana issue an opinion that was materially contradictory to U.S. Supreme Court case law? If we need to understand what the case law means, I think you need to look no further than your own decisions as a body on that issue. I don't think we need to worry about the 7th or the 11th or the 9th circuits on this issue. It's the 5th Circuit and how you interpret the U.S. Constitution, which is going to dictate whether or not the Louisiana Supreme Court got it right or got it wrong when they handled this matter. I'd flip this case and assume that it was a 1983 civil rights suit against an interrogating officer and they revoked qualified immunity. That uncertainty of the law would rise up and say no liability. Wouldn't it not? That's an area I'd be ill-equipped to speak about, Your Honor. Well, I know. I'm just saying to you that the same questions of uncertainty of law strike across in a closely related context as well. I believe there is... I appreciate your argument. ...a few doubts in this case. And I want to make one other quick point with my last minute here. With regards to the two witnesses, much has been said about the two witnesses that placed Mr. Popart in the bar. I just want to emphasize that in a criminal trial, witness testimony is not evidence unless and until it is believed and taken as evidence by the jury. The jury can choose to accept, disregard, all, part, half. By having Mr. Popart concede to that fact, there's no longer a dispute. He has lost his power of cross-examination, which the Sixth Amendment guarantees him. So I believe he suffered great harm. I don't... These two witnesses, they're not like a piece of forensic evidence that is or isn't. They are witnesses that could have been subject to the crucible of cross-examination and they may have been found wanting until, of course, Mr. Popart's incriminating statements come in against him. So I'm asking Your Honors to find that the State Court misapplied and misinterpreted the law in this case, to order the issuance of a writ of habeas corpus and to vacate Mr. Popart's sentence and conviction. Thank you. Thank you, Mr. Harrell. Your case and all of today's cases are under submission and the Court is in recess.